### Ex parte HARLAN et al.

(Circuit Court, N. D. Florida. November 1, 1909.)

1. HABEAS CORPUS (§ 112*)—SENTENCE—CORRECTION ON HABEAS CORPUS.

   On application to the federal Circuit Court for habeas corpus by one convicted therein, the court can correct the sentence if it be excessive or resentence, and hence where persons convicted of conspiring to commit a federal offense under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), were sentenced to imprisonment "at hard labor," on habeas corpus proceedings the trial court can amend the sentence nunc pro tunc by striking the quoted words, which are not authorized by the statute.

   [Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 112.*]

2. CRIMINAL LAW (§ 1208*)—PUNISHMENT—JUDICIAL POWER.

   When statutes prescribe particular modes of punishment, a court cannot inflict another, and hence under Rev. St. § 5440 (U. S. Comp. St. 1901, p. 3676), authorizing imprisonment for conspiracy to commit a federal offense, imprisonment "at hard labor" is unauthorized.

   [Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3281-3295; Dec. Dig. § 1208.*]

3. HABEAS CORPUS (§ 85*)—EVIDENCE—PARDON—LETTERS.

   A letter from the President's secretary to a senator showing a commutation of sentence is of no effect on habeas corpus proceedings by the prisoners; the President's action properly appearing by the warrant of commutation or a certified copy thereof.

   [Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 85.*]

4. PARDON (§ 8*)—WHEN EFFECTIVE.

   A pardon is not effective until delivered to the prisoner or to some one for him, being until that time subject to withdrawal and being merely a promise of pardon.

   [Ed. Note.—For other cases, see Pardon, Cent. Dig. §§ 10-15; Dec. Dig. § 8.*]

5. PARDON (§ 4*)—COMMUTATION OF PUNISHMENT—PRESIDENTIAL POWER—"PREROGATIVE TO GRANT PARDONS."

   The constitutional prerogative of the President to grant reprieves and pardons includes the power to commute punishments.

   [Ed. Note.—For other cases, see Pardon, Cent. Dig. §§ 4-6½; Dec. Dig. § 4.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

6. PARDON (§ 13*)—COMMUTED SENTENCE—EFFECT.

Where an original sentence is lawful, execution of the commuted sentence is not affected because the statutes do not permit courts in the first instance to inflict so short imprisonment.

[Ed. Note.—For other cases, see Pardon, Cent. Dig. § 27; Dec. Dig. § 13.*]

7. GRAND JURY (§ 7*)—ORDER FOR DRAWING—EFFECT.

The making of an order for the drawing and attendance of a grand jury is the exercise of a judicial power, which pertains to both judge and court, and the order does not conclude public or private rights in any way, being nothing more than a mere administrative regulation of internal affairs relating to the organization of the court.

[Ed. Note.—For other cases, see Grand Jury, Dec. Dig. § 7.*]

8. GRAND JURY (§ 7*)—ORDER FOR DRAWING—EXECUTION—JUDGE'S PRESENCE UNNECESSARY.

A judge ordering a grand jury need not be present when the order is executed.

[Ed. Note.—For other cases, see Grand Jury, Dec. Dig. § 7.*]

9. INDICTMENT AND INFORMATION (§ 137*)—QUASHING—DRAWING GRAND JURY —RIGHTS OF ACCUSED PERSONS.

If an order for a grand jury is made by the proper authority, its source, whether the court or one of its judges, is of no concern to one afterwards indicted by the jury, but if the drawing is by unauthorized persons, or from persons not properly selected or qualified, the indictment may be quashed.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 480–487; Dec. Dig. § 137.*]

10. JUDGES (§ 24*)—DUTIES—PREPARATORY ORDERS.

A federal Circuit Judge should, whenever occasion arises, make preparatory orders for the disposition of business which may come before the court at its next sitting.

[Ed. Note.—For other cases, see Judges, Cent. Dig. §§ 91–98; Dec. Dig. § 24.*]

11. JUDGES (§ 29*)—FEDERAL CIRCUIT JUDGES—POWERS.

A federal Circuit Judge can dispose of any administrative matter in any Circuit Court in his circuit properly ordered at chambers, without personally going into its territorial limits, if his chambers are held in the circuit.

[Ed. Note.—For other cases, see Judges, Dec. Dig. § 29.*]

12. GRAND JURY (§ 7*)—VALIDITY OF ORGANIZATION.

A grand jury drawn by the proper authority and composed of qualified persons is authorized to sit, unless the court of which it forms a part is holding a session at an unauthorized time or place.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. §§ 2, 16, 21; Dec. Dig. § 7.*]

13. GRAND JURY (§ 19*)—ORGANIZATION—IRREGULARITIES—WAIVER.

Any irregularity in the organization of a grand jury not affecting their authority to sit is waived by accused going to trial without raising it.

[Ed. Note.—For other cases, see Grand Jury, Cent. Dig. §§ 53–55; Dec. Dig. § 19.*]

14. INDICTMENT AND INFORMATION (§ 10*)—SUPPORT BY EVIDENCE—BURDEN OF PROOF.

A grand jury is presumed to have acted on legal evidence in returning an indictment, until accused meets his burden to show the contrary.

[Ed. Note.—For other cases, see Indictment and Information, Dec. Dig. § 10.*]

**15. INDICTMENT AND INFORMATION (§ 15\*)—PROCEEDINGS IN FINDING—REGULARITY.**

On finding an indictment to cure supposed defects in earlier indictments on the same matter, it was unnecessary that the witnesses be recalled and their testimony retaken.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 83–88; Dec. Dig. § 15.\*]

**16. INDICTMENT AND INFORMATION (§§ 10, 15\*)—FINDING INDICTMENT—JURORS' ASSENT—SUFFICIENCY.**

No formal vote of grand jurors is essential to an indictment, and if one is taken it need not be recorded, an intelligent assent of the jurors being sufficient, and there was sufficient assent, where the foreman stated in the jury room that he would sign an indictment drawn to cure supposed defects in previous indictments, and the whole body returned the indictment with others found in open court.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 50–61, 83–88; Dec. Dig. §§ 10, 15.\*]

**17. INDICTMENT AND INFORMATION (§ 196\*)—OBJECTIONS—WAIVER.**

Accused waived an objection to the indictment on the ground that the grand jurors did not assent to it, by going to trial without raising the objection.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 628–635; Dec. Dig. § 196.\*]

**18. HABEAS CORPUS (§ 27\*)—SCOPE OF REVIEW—COLLATERAL ATTACK ON CONVICTION.**

Where on habeas corpus it appears that petitioners were convicted of an offense of which the trial court had jurisdiction, were in lawful custody, were tried on an indictment charging an offense in that district, were confronted with the witnesses, and given a jury trial, and the record does not show infringement of constitutional rights, the conviction cannot be attacked on the ground that the offense if committed at all was committed in another district.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 27.\*]

**19. HABEAS CORPUS (§ 85\*)—BILL OF EXCEPTIONS—EFFECT.**

A bill of exceptions can be treated as part of the record proper only in an appellate proceeding, being improperly used on habeas corpus to show error by the trial court, and especially on a point which has been affirmed by a higher court, and hence on habeas corpus the bill of exceptions will not be opened to determine from the evidence whether the offense was committed in another jurisdiction.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 85.\*]

**20. HABEAS CORPUS (§ 27\*)—CONVICTIONS—VALIDITY—IRREGULAR TERM OF COURT.**

An indictment, conviction, and sentence by a court sitting at an unauthorized time are void, the proceedings not being cured by a trial by an appellate court on the record, not de novo.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 27.\*]

**21. CRIMINAL LAW (§ 1180\*)—APPEAL—EFFECT OF FORMER JUDGMENT.**

A judgment of the Circuit Court of Appeals affirming a conviction does not preclude a subsequent reversal for want of the trial court's jurisdiction, where the question is not presented on the first appeal.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 3002–3004; Dec. Dig. § 1180.\*]

**22. HABEAS CORPUS (§ 27\*)—RIGHT TO RELIEF—VOID CONVICTION.**

If the record in habeas corpus shows that petitioner is detained under a conviction had at an unauthorized term of court, he is entitled to relief

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

on habeas corpus, as having been deprived of liberty without due pro-
cess of law, in violation of Const. Amend. U. S. 5.

[Ed. Note.—For other cases, see Habeas Corpus, Dec. Dig. § 27.*]

23. COURTS (§ 412*)—UNITED STATES CIRCUIT COURTS—TERMS.
Under Rev. St. § 658 (U. S. Comp. St. 1901, p. 530), providing for terms
of the Circuit Court in the Northern district of Florida at Tallahassee
on the first Monday in February and at Pensacola on the first Monday in
March, the court has every day of the succeeding 12 months in which to
sit at each place unless the right to hold court during that period is
terminated by final adjournment or by nonattendance at the commence-
ment of the term and failure to instruct the marshal to adjourn to a sub-
sequent day in the term; and, after a term has been regularly opened,
a judge's failure to open court on a day of the term to which a recess
has been taken, or to appoint a time when court will be resumed does
not forfeit the right to resume sittings at any time.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 412.*]

24. COURTS (§ 412*)—FEDERAL COURTS—TERMS.
Under Rev. St. § 658 (U. S. Comp. St. 1901, p. 530), fixing the terms of
the Circuit Court in the Northern district of Florida, an order that,
pending the absence of the judge, the court be opened and adjourned pur-
suant to a rule of the court did not constitute a final adjournment.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 412.*]

25. COURTS (§ 113*)—FEDERAL CIRCUIT COURTS—MINUTES—TIME FOR ENTER-
ING.
The clerk of a federal Circuit Court has until the end of term in which
to complete the minute entries for the term.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 113.*]

26. COURTS (§ 113*)—FEDERAL CIRCUIT COURTS—MINUTES—METHOD OF ENTRY.
Minute entries by a federal Circuit Court clerk in a record recognized
by the court as its minutes are valid though made with a rubber stamp.

[Ed. Note.—For other cases, see Courts, Dec. Dig. § 113.*]

27. BAIL (§ 44*)—CRIMINAL CASES—JUDICIAL DISCRETION.
There is no constitutional right to bail after a conviction; it being
properly granted or denied as best effects justice, determined in the light
of the common law, as affected by acts of Congress.

[Ed. Note.—For other cases, see Bail, Cent. Dig. § 145; Dec. Dig. § 44.*
Right to release on bail pending appeals or writ of error, see note to
Walsh v. United States. 99 C. C. A. 135.]

Petition by W. S. Harlan, C. C. Hilton, and S. E. Huggins for a
writ of habeas corpus. Writ discharged, and prisoners remanded.

The petitioners, W. S. Harlan, C. C. Hilton, and S. E. Huggins, were
tried and convicted at the November sitting, 1906, of the Circuit Court at
Pensacola, Fla., under an indictment which charged them with combining
and conspiring within the Northern district of Florida, to hold, arrest, and
return one Rudolf Lanninger to a condition of peonage, and that subse-
quently the defendants, with the exception of Harlan, committed an overt
act, within the said district, for the purpose of effecting the object of the
conspiracy. Harlan was sentenced to imprisonment at hard labor for 18
months in the federal penitentiary, at Atlanta, Ga., and to pay a fine of
$5,000, and the defendants Hilton and Huggins were sentenced to like im-
prisonment for a period of 13 months, and to pay a fine of $1,000 each.
Being in the custody of the marshal under warrants of commitment, issued
in execution of the mandate of the Circuit Court of Appeals, to which they
had unsuccessfully sued out a writ of error, to reverse their conviction, they
petitioned for discharge on habeas corpus, alleging that they were illegally
held in custody "without warrant or authority of law, in violation of the
Constitution and laws of the United States," because (1) they were sentenced

to hard labor in the United States penitentiary at Atlanta, whereas the statutes of the United States do not authorize such punishment for the offense of which they were convicted, and the sentences are in excess of the authority of the court, and void; (2) since the passing of the sentences, the President of the United States has commuted the punishment to six months' imprisonment, and there is, therefore, no authority now for the execution of such sentences in the penitentiary, even if otherwise valid; (3) the petitioners were convicted and sentenced for an offense, which if committed, was committed in the Middle district of Alabama, and not elsewhere, and the Circuit Court of the United States for the Northern district of Florida had no jurisdiction to try or sentence them; (4) the grand jury which returned the indictment was not organized as required by law, in that the court was ordered to be held on the 12th day of November, 1906, when in truth and in fact it was convened in the week preceding, to wit, November 7th, 1906; (5) the grand jury which indicted the petitioners had no authority to sit as a grand jury, and the court itself, at the time the convictions were had, was holding neither a special nor a regular term, lawfully authorized to be held; (6) no legal evidence was introduced before the grand jury, authorizing the finding of a true bill, or the indictment upon which the petitioners were convicted. In obedience to the writ the marshal produced the bodies of petitioners and certified as the cause of their detention the convictions and sentences heretofore recited. The United States moved to amend and correct the sentences and warrants of commitment by striking out the words "at hard labor," so that the sentences and commitments would simply be for imprisonment in the penitentiary. The petitioners denied the power of the court to grant the motion or make the correction at a subsequent term, and insisted that the inclusion of the words "at hard labor" in the sentences rendered them a nullity in their entirety, and that petitioners were entitled to an immediate discharge. Petitioners also offered in evidence the record of the trials in the circuit court, including the bill of exceptions reserved on the trial, and insisted it thus appeared on the face of the record, especially in the case of Harlan, that the offense of which the petitioners were convicted had been committed in the Middle district of Alabama and not in the Northern district of Florida. They also offered in evidence an orginal letter, admitted to be genuine, which read as follows:

"The White House,
"Washington, September 23, 1909.

"My dear Senator: I am in receipt of your letter of the 21st of September concerning the commutation of W. S. Harlan. The Attorney General recommended commutation of Harlan's sentence to six months' imprisonment, and the same as to Huggins and Hilton; and denial as to Gallagher and Grace. The President endorsed the case as follows: 'Commute Harlan's Huggins' and Hilton's sentences as recommended by the Attorney General—As to Gallagher and Grace application denied.'

"Very truly yours, Fred W. Carpenter, Secretary to the President.
"Hon. James P. Taliaferro, U. S. S. Jacksonville, Fla."

Much evidence was offered touching the manner of making entries on the minutes. These minute entries showed that the Circuit Court had been opened by the presiding judge, the Hon. Charles Swayne, at the commencement of the regular term in March, 1906, and continued in session by adjournments from day to day to the 6th of June. On that day, the court met and made decrees in several cases, which were entered on the minutes, and then without adjourning to any particular day, ordered "pending the absence of the presiding judge of the court, that the same be opened and adjourned in pursuance of rule 13 of the rules of practice of the court." The rule read as follows: "During the temporary absence of the judge, the court shall be deemed opened daily at each of the clerk's offices in the district for the transaction of business on the equity side of the court, and also for the filing of papers and the transaction of business of a general character in the court, and the clerk shall be present in person or by a deputy, and a record of the same shall be entered upon the minutes of the

court upon each day." After the order, the court was adjourned by the clerk and marshal from day to day until the 6th day of November, 1906, when the judge returned and opened the court daily thereafter, until the trial, conviction, and sentences were had in these cases. It was shown that Judge Swayne was the only judge who held the United States courts for the Northern district of Florida during the year 1906, and that he held a Circuit Court at Tallahassee, as late as the 15th day of May, 1906. The civil and criminal minutes were kept in different books, the clerk testifying that some of the entries relating to these cases were completed as late as December 21, 1906, from the records and memoranda made during the trial, and that though these minutes had not been signed by the presiding judge, the bound books in which the minute entries were contained had been and were treated by the court as its minutes during the period covered by them.

The evidence further showed that the clerk used two india rubber stamps. One was used when the presiding judge was present and read as follows: "At a stated term of the Circuit Court of the United States held within and for the Northern District of Florida, begun and held at the City of Pensacola on the ―――― day of ――――, A. D. 190―― present the Honorable Charles Swayne, Judge." Among other proceedings had were the following, to wit: "It was ordered that the court adjourn until tomorrow morning at 10 o'clock." The other rubber stamp, used when the judge was not present, read as follows: "Court was opened pursuant to said order. Present the clerk and marshal. It was ordered that the court adjourn until tomorrow morning at 10 o'clock." The body of the entries was the impression of the stamp, and the interlineations were with pen and ink. The petitioners objected to these entries, insisting that they were mere narratives of past transactions, and were made with rubber stamps, and did not constitute the record of the court.

The minutes and testimony of the clerk show that the Honorable David D. Shelby, United States Circuit Judge, mailed from Huntsville, Ala., on October 23, 1906, the following orders, which were received by the clerk at Pensacola, Fla., on October 24, 1906, to wit:

"Ordered, that there be drawn from the jury box by the clerk and marshal of this court, in accordance with the rules and practice thereof, the names of thirty-six persons, competent and qualified to serve as petit jurors in said court, for whom a venire facias shall issue returnable on the 12th day of November, 1906. October 23, 1906.
                    "David D. Shelby, United States Circuit Judge.

"Ordered, in accordance with the rules of practice of this court, that a grand jury be impaneled therein on the 7th day of November, 1906, and that the clerk and marshal draw from the jury box the names of twenty-three competent and qualified persons who shall be summoned to serve as grand jurors in said court at said term. October 23, 1906.
                    "David D. Shelby, United States Circuit Judge."

At the time these orders were made, Judge Shelby was not in the state of Florida, but was in Alabama. In compliance with the orders so made, the clerk and marshal on October 24, 1906, drew the venire for the grand and petit juries, which were organized respectively at the time fixed in the orders, Judge Swayne himself having opened court on the 5th day of November, 1906.

The evidence showed that after the grand jury had found two indictments against the petitioners, it was supposed they were defective, and the United States attorney requested the grand jury to remain in session until he could draw and present a new or third indictment. This he did, explaining wherein the third indictment differed from the others, and that it required the action and consent of the grand jury before it could be presented. He then retired from the room. Several of the grand jurors were called as witnesses. Some of them testified they did not vote on the last indictment, while others testified they did not recollect whether they did or not. All who testified stated they heard no objection to the finding of the bill, and that there was a consultation beween the foreman and members of the grand jury in the room when the indictment was read over to them. The

foreman testified: "I think we took no rising vote on the indictment, and I asked if it was consented to, and it was agreed that it was to be signed by the foreman. Probably we took no vote formally." He further testified: "I asked if there was any objection to the indictment, and a good many said no, and others remained silent, and I said, 'I will sign it.'" Immediately after the foreman signed the bill, the grand jurors went in a body into the courtroom, and delivered this indictment, with others found at that term, to the presiding judge in open court. Nothing was then done by any of the grand jurors regarding any of the indictments except the presentation of their formal report, giving among other things the number of "true bills," they had "returned," and asking to be discharged. Counsel for petitioners testified the first intimation he had that no vote had been taken on the indictment came to him on the 30th of October, 1909, as a result of his search a day or two prior to the issue of the writ of the minute entries and for the grand jury docket, and in consequence of answers of several of the grand jurors to his inquiries, and that the petitioners were not aware until then that no vote had been taken upon the finding of the indictment.

After hearing all the evidence, the court discharged the writ, and ordered the prisoners remanded to the custody of the marshal in execution of the sentences which were corrected nunc pro tunc, in accordance with the prayer of the motion of the government, but, for reasons stated in the opinion, allowed them to give bail. pending appeal to the Supreme Court, to answer its judgment in the premises.

W. W. Flournoy and J. F. Stallings, for petitioners.
R. P. Reese, Sp. Asst. Atty. Gen., contra.

JONES, District Judge[1] (after stating the facts as above). As the hearing on habeas corpus is summary, and before the court without a jury, and is not governed by technical rules of pleading or evidence, the court allowed petitioners to introduce such evidence as they deemed material to their contentions, without then passing upon their relevancy or legality, reserving decision as to these matters until it came to render judgment on the merits of petitioners' applications.

1. Section 5440 of the Revised Statutes (U. S. Comp. St. 1901, p. 3676) authorizes the court upon conviction of a violation of its provisions, to inflict a "penalty" within certain limits, and imprisonment in the penitentiary for not more than two years. The sentences conformed to the statute regarding the penalty, and the length of imprisonment, but instead of imposing imprisonment in the penitentiary, imposed imprisonment at hard labor in the penitentiary. It is insisted that the sentences, being in excess of the authority of the court, are nullities, and furnish no warrant for detaining the petitioners. Conceding that a sentence to hard labor is in excess of the jurisdiction, and void to the extent of such excess of jurisdiction, the question arises, What is the proper practice as to the issue of the writ of habeas corpus in a case like this? United States v. Pridgeon, 153 U. S. 48, 14 Sup. Ct. 746, 38 L. Ed. 631, is much like this in principle, the only difference being that here the application for relief is to the court of original jurisdiction, while there, it was made to another court, in whose territorial jurisdiction Pridgeon was confined. The Supreme Court held in that case, that "where a court has jurisdiction of the person and offense, the imposition of a sentence in excess of what

---

[1] Specially designated, the judge of the district having been of counsel.

the law permits does not render the legal or authorized portion of the sentence void, but leaves only such part of it as may be in excess, open to question and attack." In the conclusion of its opinion, the court was particular to say, "It did not consider it necessary or proper to express any opinion as to what would have been the proper action of the Circuit Court in dealing with the petitioner's application," and refrained from intimating even whether the proper practice would be to deny the writ and leave the petitioner to his writ of error, or to issue the writ of habeas corpus, and commit the prisoner to the custody of the penitentiary officials, with directions to carry out and enforce only that part of the sentence imposing imprisonment according to the rules and regulations of the institution. In Re Bonner, 151 U. S. 242–259, 14 Sup. Ct. 323, 326 (38 L. Ed. 149), where the Supreme Court discusses the question at some length, Mr. Justice Field speaking of cases where the conviction itself is correct, and "the excess of jurisdiction on the part of the court being in enlarging the punishment or enforcing it in a different mode or place than that provided by law," says:

"In such case, there need not be any failure of justice, for where the conviction is correct, and the error or excess of jurisdiction has been as stated, there does not seem to be any good reason why the jurisdiction of the person shall not be reassumed by the court that imposed the sentence in order that its defects may be corrected. * * * In such case, the original court would only set aside what it had no authority to do, and substitute the direction required by law to be done upon the conviction of the offender."

The whole opinion is a strong admonition to the courts to conform strictly to the terms of the statutes in imposing sentences. Here, the application for the writ is to the court of original jurisdiction, and the court, the prisoners still being within its control, has full power to correct the sentences, or, if need be, resentence according to law, and for many obvious reasons, it is better for this court to issue the writ and bring up the prisoners and correct an unauthorized sentence than to leave that duty to be performed by other courts. Reynolds v. United States, 98 U. S. 145–167, 25 L. Ed. 244, opinion on rehearing.

The writ having issued, and the prisoners being in court, and having had due notice, the government moves to amend the sentences nunc pro tunc by expunging therefrom the part imposing "hard labor." These words can be expunged without affecting in any way the validity of that part of the sentence which already provides for imprisonment in the penitentiary. The words are not so interwoven and intermingled with the purpose of the rest of the sentence, or the language in which it is expressed, that they cannot be stricken out, and still leave the corrected sentence perfect, and capable of execution according to the command of the statute, and the judgment of the court in that respect. When statutes prescribe particular kinds or modes of punishment, the court has no power to inflict any other. The statute nowhere authorizes the court to impose hard labor on conviction for the offense, though it does authorize and require imprisonment in the penitentiary. When the court went further than imprisonment in the penitentiary, and prescribed hard labor, it cut loose from the authority of the statute, and exceeded its jurisdiction, and

to the extent of such excess, its action is a nullity. It is true that hard labor may be inflicted by the penitentiary authorities, where the sentence is to imprisonment in the penitentiary merely; but in that case, hard labor is inflicted, not in obedience to the command in the sentence, but because of the status of confinement in the penitentiary, under whose rules hard labor may be administered, if they so provide, whether included in the sentence or not. No law gives the court, the power to determine what the rules and discipline of the penitentiary shall be. The citizen has the right to stand on the law as it is, and to insist that the court, by imposing modes of punishment which the statute does not provide for the offense, shall not determine questions which the law leaves solely to the prison authorities, under the statutes regulating federal penitentiaries. Plainly, that part of the sentence which imposed hard labor is without warrant in law, beyond the power of the court to inflict in any event on a conviction for this offense, and is invasive of the legal rights of petitioners. Manifestly, it is the duty of the trial court, when its attention is called to its unauthorized action, to correct the sentence nunc pro tunc in this particular.

2. While the writer does not doubt in view of the statement in the letter from the President's secretary to Senator Taliaferro, that the President has ordered the sentences in these cases to be commuted to six months' imprisonment, the court can take no action upon it. A pardon must be delivered to the prisoner, or some one for him, before it can become legally effective. Until then, it rests in the pleasure of the pardoning power to rescind and withdraw what, up to that time, is a mere promise to grant a favor in the future. It is not shown that any warrant of commutation has ever issued or been delivered. Had that been done, as the action of the executive must appear by matter of record, it could be shown only by the production of the warrant of commutation, or a certified copy thereof. These matters aside, had a warrant of commutation issued and been delivered to the prisoners, and exhibited to the court, it would not afford the slightest reason for interfering with the execution of the commuted sentence in the penitentiary. The constitutional prerogative of the President to grant reprieves and pardons includes the power to commute punishments. A common exercise of the power is where without changing the mode of punishment, less of that kind of punishment is exacted and substituted for the greater punishment of the same kind required by the original sentence. Here, the punishment fixed was imprisonment in the penitentiary for a certain time, and it is changed to imprisonment there for a less time. The original sentence to the penitentiary being lawful, and the President having the power to shorten the length of imprisonment without otherwise interfering with it, the execution of the commuted sentence in the penitentiary cannot be unlawful merely because the statutes do not authorize the courts, in fixing the punishment in the first instance, to inflict imprisonment in the penitentiary for so short a time. In re William Wells, 18 How. 307, 15 L. Ed. 421.

3. When the Circuit Court is in session, it necessarily makes the order to draw the grand jury to attend its sitting. At other times, the

order is properly made by any "one of the judges of such Circuit Court," in his discretion. Rev. St. § 810. Under our statutes, whatever may have been the case at the common law (Curtis v. Commonwealth, 87 Va. 589, 13 S. E. 73), the making of an order for the drawing and attendance of a grand jury is the exercise of judicial power, but the power pertains to the judge, as well as to the court. Such an order does not determine anything with reference to any adversary proceeding in the court, or conclude public or private rights in any way, and amounts to nothing more than a mere administrative regulation of internal affairs relating to the organization of the court. There is nothing in the nature of the order which calls for the presence of the judge when the court officers execute its command. So long as the order is made by the proper authority, its source, whether the court, or one of its judges, is of no concern to the defendant who is afterwards indicted by the grand jury; though if the grand jury be drawn by unauthorized persons, or from persons not properly selected or qualified and the like, he has his remedy by motion to quash the indictment when he is called to answer it. Judge Shelby was one of the judges of the Circuit Court for the Northern district of Florida, when he made his order of October 23, 1906, for the drawing of a grand jury to attend the Circuit Court for the Northern district of Florida, on the 7th of November following. As such, he had the right, and was under duty, whenever occasion arose, to make preparatory orders for the disposition of business which might come before the court at its next sitting. His general authority as to such matters is not questioned, but it is insisted in this instance, his order is a nullity, and, apart from another objection hereinafter considered, could not authorize the assembling of a grand jury, because Judge Shelby was in Alabama, and did not come personally into the territorial jurisdiction of the circuit court for this district, at the time of making the order. This contention is untenable both on reason and authority.

While Judge Shelby is "one of the judges" of this court, he is at the same time one of the judges of all the other circuit courts in this judicial circuit, which, at the time the order was made, were required to be held in as many as 56 different places in the six states constituting the Fifth judicial circuit. The necessity for the exercise of his administrative functions regarding these numerous courts is constantly arising, in such matters as the adjournment of a court, when the circuit or district judge who purposed to hold that court cannot attend, or postponing the day fixed for the sitting of a court to another day or drawing of juries in advance to be in readiness for the court when it convenes, and the like, yet, at that very time, he may be holding another circuit court himself, or sitting with the Court of Appeals. To require a circuit judge to abandon his duty in every other court, and to come personally into the territorial jurisdiction of a particular court, before he can lawfully exercise his administrative functions concerning it, would, in a large measure, prevent the exercise of his functions as to other courts at the same time, and for the time being, convert him, for all practical purposes, into a judge of only one of them, though the statutes, at least, while he is in the discharge of his judicial duties anywhere in the Fifth judicial circuit, make him

the judge of all of them at the same time. The operation of such a rule would inevitably hinder and clog the administration of justice, and undermine the purpose of Congress in the creation of the circuit judges and the duties conferred upon them. A circuit judge may rightfully dispose of any administrative matter in any circuit court in his judicial circuit, which may be properly ordered at chambers, without personally going into its territorial limits, wherever his chambers may be for the time being, so long as they are held at any place within his judicial circuit. In re Parker, 131 U. S. 221, 9 Sup. Ct. 708, 33 L. Ed. 123; Horn v. Pere Marquette R. R. Co. (C. C.) 151 Fed. 626; Ex parte Steele (C. C.) 161 Fed. 886. Apart from this, the persons summoned were qualified to serve as grand jurors, selected for that purpose by the officers provided by law, and drawn pursuant to an order of a judge and the rules of the court by officials to whom the law commits the duty. A grand jury so drawn certainly cannot be without "authority to sit as a grand jury," unless the court of which it formed a part was itself holding a session at a time or place not authorized by law. If in any other way, there was a want of strict conformity to law in their convening, it was a mere irregularity which was waived by the defendants' pleading not guilty and going to trial, without first calling the attention of the trial court to it in some appropriate way.

4. Waiving the question whether the objection that no "legal evidence was introduced before the grand jury authorizing the finding of the indictment" can be raised for the first time after plea and conviction, and whether a sentence can ever be attacked collaterally on such a ground, it suffices to say that neither the record of the trial, nor the evidence introduced on this hearing, supports that averment of the petition. The presumption, until the contrary appears, is that the grand jury acted upon legal evidence, and the burden rests on him who asserts that it did not to prove it. This indictment was evidently founded upon the testimony of witnesses on two previous days touching the offense upon which the grand jury at that session had already found two other indictments; and was preferred, to cure supposed defects in the earlier indictments touching the same matter. Under such circumstances, it was not necessary, or at all essential to the validity of the last indictment, that the witnesses be recalled before the grand jury and go over their former testimony. The attention of the grand jury was pointedly directed to this indictment, whose disposition was the only unfinished business before it. After it was discussed, the foreman said he would sign it, and the grand jurors made no objection. Immediately afterwards, they went in a body to the courtroom and made a report of the number of "true bills" they had found, which included this one, and delivered them to the presiding judge in open court. No formal vote of jurors is essential to the finding of a true bill, and the law requires no record of such a vote, if taken. The intelligent assent of the jurors to the making of the accusation is all that the law requires, and it provides the mode by which that assent must appear, by the requirement that the grand jury itself deliver the indictment to the judge in open court. When, as the record itself,

as well as the testimony shows, the grand jury went in a body before the court and returned these indictments with others found at that time, signed by the foreman and the United States attorney, and delivered them to the presiding judge in open court, that furnished evidence that the grand jury had found the bills, and assented to them as "true bills," and was proof in the most solemn form that it had regularly discharged its constitutional functions as an accuser regarding the particular matter. When the petitioners pleaded not guilty and went to trial without first raising the objection, it was an admission of record by them that the indictments had been properly found and constituted a genuine record of the court. The necessities of this case do not require the court to follow counsel in their elaborate argument as to the power of the court at a subsequent term to discharge a prisoner, who is still within its control, after conviction and sentence, when he has been tried on an indictment which was never in fact acted on by the grand jury, but got upon the court records by mistake, or was palmed off on the court by trickery or fraud. It may be in such a case that due regard for "truth and justice, and the preservation of the verity and dignity of its own records, and the protection of the citizen, and the preservation of the constitutional guaranty," in its integrity, would compel the court to expunge the indictment from its record as a spurious paper, and thereupon treat the conviction as though the prisoner had been tried without indictment at all, and, if the prisoner were still in its control, require the court to bring him up on habeas corpus and discharge him. Sparrenberger v. State, 53 Ala. 482, 25 Am. Rep. 643; United States v. Coolidge, 2 Gall. 367, Fed. Cas. No. 14,858; Low's Case, 4 Greenl. (Me.) 439, 16 Am. Dec. 271. This case clearly does not present that question.

5. It is insisted with much confidence that the application to the facts of these cases of the doctrine declared in Re Bain, 121 U. S. 1, 7 Sup. Ct. 781, 30 L. Ed. 849, and Hans Nielsen, 131 U. S. 176, 9 Sup. Ct. 672, 33 L. Ed. 118, as to the denial of constitutional rights in a criminal trial, requires the discharge of petitioners on grounds other than those hereinbefore mentioned, which it is urged appear on the face of the record. The first is that the court had no jurisdiction to try or detain the petitioners, because they were tried and convicted in violation of the sixth amendment, in the Northern district of Florida, for an offense, which, if committed at all, was committed in the Middle district of Alabama, and that, "under the authority of Hyde v. Shine, 199 U. S. 84 [25 Sup. Ct. 760, 50 L. Ed. 90], while this court upon habeas corpus may not weigh the evidence, yet, upon habeas corpus, this court should examine the evidence to see whether it shows, as claimed by the petitioners, affirmatively, conclusively and without contradiction, entire lack of evidence to support the accusation, and if so found, then this court should discharge the prisoner." This court had undoubted jurisdiction of the offense for which the petitioners were indicted. They were lawfully in the custody of the court, and were arraigned upon an indictment which charged that the offense was committed within the Northern district of Florida. They were confronted with the witnesses against them, and given a trial

by a jury, which, by its verdict affirmed the truth of the accusation made in the indictment, and were, thereupon, convicted and sentenced. The record itself does not show that any error intervened in the trial on account of the denial of any constitutional right or otherwise which invalidated the conviction, or that anything has happened subsequent thereto which puts an end to the power of the court over the prisoners. On such a state of the record, the Supreme Court has always held that a conviction cannot be collaterally attacked on habeas corpus. A bill of exceptions is no part of the record proper, and can be treated as a part of it only in an appellate proceeding. It cannot be used on habeas corpus, to put even the trial court in error, much less can its recitals be made the foundation for the lower court's reversing the ruling of the higher court, wherein the action of the trial court which is made the basis of the application for habeas corpus was distinctly urged as error, and held to be free from error. Petitioners' invitation to open the bill of exceptions and weigh the evidence therein recited, in order to determine that the offense was committed in another district, as it is contended the cases of Hyde v. Shine, 199 U. S. 84, 25 Sup. Ct. 760, 50 L. Ed. 90, and Tinsley v. Treat, 205 U. S. 20, 27 Sup. Ct. 430, 51 L. Ed. 689, require it to do, must, therefore, be declined; and this, although their contention were conceded that the formation of the conspiracy alone constituting the offense, it necessarily follows, under the sixth amendment, that the conspirators can be indicted only in the district wherein the conspiracy was formed, though an overt act be done by some of the conspirators, in the furtherance of its objects, in another district.

6. The next ground urged for discharge is that the petitioners were indicted, convicted, and sentenced by a court which was sitting at a time not authorized by law. If this be true, the proceeding from beginning to end would be coram non judice and void, and the affirmance of the conviction, by an appellate court, in which the trial is on the record and not de novo, would not cure the infirmity of a want of jurisdiction in the court which pronounced the sentence. Scott v. McNeal, 154 U. S. 34, 14 Sup. Ct. 1108, 38 L. Ed. 896. Besides, the minute entries relied on to show that the sitting of the court was at an unauthorized time, though distinctly appearing on the record presented on this hearing, were not fully certified in the record sent to the Court of Appeals on writ of error, and the question was not brought to its attention in any way, or even mentioned by the remotest inference in the per curiam opinion handed down on the affirmance. The Court of Appeals, under such circumstances, would not be bound by its judgment of affirmance in any subsequent proceeding, which might come before it, involving the want of jurisdiction in the lower court in this very matter. Boyd v. Alabama, 94 U. S. 645, 24 L. Ed. 302. If the record itself shows petitioners are detained, under a conviction and sentence of a court which was sitting at a time not authorized by law, a case is presented of a deprivation of liberty without due process of law in violation of the fifth amendment to the Constitution, and the Circuit Court never had or can require jurisdiction of the person, by virtue of the proceedings at such

a sitting, and; under the doctrine of the Bain and Nielsen Cases, the petitioners would be entitled to relief on habeas corpus.

7. The record shows that the regular March term of this court at Pensacola, for 1906, was opened by the district judge, at the time appointed by law; that the court continued in session, as its business required, until and including the 6th day of June, when, at the close of the sitting, it was ordered "pending the absence of the judge, the court be opened and adjourned pursuant to rule 13 of the rules of practice of this court," and that in pursuance of the order, the clerk and marshal, in the absence of the judge, opened and adjourned the Circuit Court daily, from the 6th day of June until the 7th day of November, when the presiding judge returned and presided over the court, until the convictions in these cases were had. Petitioners insist the term thereby lapsed, and the court was then sitting without authority of law. They argue the court should have made an order on the 6th day of June, fixing the day when the court would resume its sitting, and that not having done so, its action amounts to an adjournment sine die; that the clerk had no authority to open and adjourn the court, in the absence of the judge, except when the latter fails to appear at the commencement of the regular term; that the court was powerless to delegate such authority to the clerk; and that the order and everything done under it are void.

Section 658 of the Revised Statutes (U. S. Comp. St. 1901, p. 530), as amended by subsequent enactments, provides that the regular term of the Circuit Courts for the Northern district of Florida shall be held in each year at Tallahassee on the first Monday in February, and at Pensacola on the first Monday in March. It relates to the holding of courts already organized, with jurisdiction fully defined, and designs to fix not only the date when they must begin their regular sessions, but to prescribe the length of time thereafter in which these courts shall have opportunity and right to remain in session, at each regular term, to accomplish the purpose for which the courts were created. Bearing in mind the accepted meaning of the word "term," when used in this connection, the plain command of the statute is that the Circuit Court must commence to sit at Pensacola on the first Monday in March of each year, and have the succeeding 12 months in which to sit for the dispatch of business; unless the judges put an end to their right to hold the court during that period by final adjournment, or by nonattendance at the commencement of the regular term in any year and failure, in that event, to provide against a lapse of the term, by instructing the marshal, in the absence of the judges, to adjourn to some subsequent day of the term. This full 12 months, in which this court may dispatch its business, is contemplated here, notwithstanding the requirement of the regular session at Tallahassee each year. There are five judges who may sit in the Circuit Court aside from those who may be specially designated, and they are authorized to hold Circuit Courts at the same time in the same district. The requirement to hold the Circuit Court at Tallahassee does not, therefore, evince any legislative intention to interrupt the sittings of the court at Pensacola during the regular March

term. In the absence of a statute so providing, it is impossible on principle to hold, after the regular term has been opened in conformity to law, that the failure of a judge subsequently to open a court on a day of the term to which a recess has been taken, or the cessation by the court of a particular sitting without appointing the time when it will be resumed, can forfeit the right of the court to resume its sittings at any time during the remainder of the term. The court's authority to sit at Pensacola, for a period of 12 months in each regular term, having been conferred by statute and perfected by the prompt convening of the regular March term, the right to hold court exists in full vigor throughout every day of the whole 12 months, until the court puts an end to its authority by a final adjournment, or the right has been extinguished by operation of law, by the arrival of the day fixed by law for the commencement of the next regular term, or by legislation changing the time or place of holding the court. That there may not have been an unbroken chain of adjournments, from June to November, or that the court ceased an intermediate sitting, without announcing when it would resume the sitting, or failed to attend on a day to which the court adjourned a sitting, cannot alter the fact that November, in which the sitting here complained of was had, fell within the 12-month period during which the law authorized the court to sit at Pensacola.

There are cogent reasons, apart from the fact that there is no authority of law to begin a regular term except at the time the statute provides, why the courts in general have attached consequences to the failure to open a regular term at the time prescribed by law, which they do not visit upon the failure to open court at any subsequent period of the term. The day fixed by law for the beginning of a regular term determines when process shall be returned, bail produce their principal, judgments may be taken for want of appearance or plea, and cases tried or set down for disposition. To compel litigants, witnesses, and court officers to remain in attendance on a court after the day fixed for the beginning of the regular term, and wait indefinitely until such time as the judges may chance to appear and open court, would work grievous injustice to litigants and produce much public inconvenience. When the regular term has been opened on time, and the court recesses, persons then in attendance take notice when it will resume its sitting, and of its orders in relation to pending business. The only likelihood of injustice on the court's reconvening is that a litigant may be unprepared, or not have timely notice when his case is called for trial, and orders be taken in it—consequences which can generally be avoided by ordinary diligence, and inquiry of court officers about what was done at the first sitting of the term. There is certainly nothing in the law relating to the holding of the Circuit Court (sections 671, 672, Rev. St. [U. S. Comp. St. 1901, pp. 545, 546]), which indicates any intention to lapse the regular term, or to shorten any portion of it, after it has been regularly opened at the time appointed by law, for any of the reasons which it is here contended bring about that result. The statutes guard against lapses of regular terms by providing that the judge when he cannot be present

to open the court, at the commencement of the term, may still control the subsequent sittings at that term, by written order to certain officers of the court to adjourn "from time to time, as the case may require, to any time before the regular term." Congress was not unmindful of the vicissitudes to which human affairs are subject, or ignorant that numerous contingencies, such as the sudden illness of the judge, or a member of his family, the breaking out, at the place where the court is held, of a riot or civil commotion, the obstacles of a flood or an extraordinary fall of snow, the prevalence of an epidemic, or other unusual or providential occurrence, often cause the absence of the judge, and a consequent adjournment of a court during a term. The fact is, therefore, most significant, in this connection, that Congress provided for the lapse of the term only in the contingency of failure to open the court, in consequence of the absence· of the judge, at the very time appointed by law for the commencement of the regular term. It seems clear, therefore, that Congress never intended that the period it gave the court in which to administer justice at any regular term, after the power of the court over the term had been rightfully put in motion, should be shortened or lapsed for the remainder of the time because of absence of the judge or irregular sittings. Neither the letter nor spirit of the statutes, nor the customs of our country, nor the conditions under which justice is administered here, nor any consideration of public necessity or convenience warrants us in attaching those consequences to the failure of. a judge to open the court at other times, which the statute exacts only for failure to commence the holding of the regular term at the time the law fixes for its beginning. It is the particular time when the judge is absent, not his mere absence and failure to open court, which determines whether the failure to open court shall lapse the term. There are a few authorities, of which Wight v. Wallbaum, 39 Ill. 554–561, is an example, which hold that the failure of a judge to open the court, at the time to which a recess is taken, lapses the term. These authorities are not in harmony with the current of authority, and treat the question as though it were one of jurisdiction, when it really relates only to the regularity of the exercise of jurisdiction after it has attached.

The term here was regularly opened in March, and did not expire until the day fixed by law for the commencement of the next regular term, and the court, meanwhile, did no act which put an end to its right to sit in November. At the last sitting in June, it not only did not adjourn to any particular day, but made an order which, when considered in connection with the rule of the court to which it referred, is far from evincing any purpose to take a final adjournment for the term. It meant only to provide for the interval in the sittings, during the "temporary absence of the judge." The only just interpretation of the order is that the judge intended to return and resume the sitting of the court at some subsequent day during the term. Conceding that the clerk, unless specially authorized by statute, cannot open and adjourn court in the absence of the judge, so as to give validity to its sittings, we will treat the case as if the court had ter-

minated its sittings on June 6th, without making any order as to the time when it would resume its sessions, and did not afterwards reconvene until November following. Thus construing the record, the court was not sitting without authority of law when these convictions were had in November. The term not ending until the first Monday in March, 1907, the clerk had until that date to complete the minute entries of the court, and these entries having been made during the term, though with a rubber stamp, and entered upon a record which the court recognized as its minutes, must be accorded verity and accepted as its minutes for the term. The November sitting constituted neither a special term, nor an adjourned term, but was simply a continuation of the regular term, the court having merely suspended its sessions from June to November. Schofield v. Horse Springs Cattle Co. (C. C.) 65 Fed. 433; People v. Sullivan, 115 N. Y. 185, 21 N. E. 1039; Freeman on Judgments, § 90; Hume v. Bowie, 148 U. S. 245, 13 Sup. Ct. 582, 37 L. Ed. 438; Union Pac. R. R. Co. v. Hand, 7 Kan. 380; E. T. I. & C. Co. v. Wiggin, 68 Fed. 446, 15 C. C. A. 510; Harrison v. German-American Fire Insurance Co. (C. C.) 90 Fed. 758–762; State ex rel. Barber v. McBain, 102 Wis. 431–435, 78 N. W. 602; State of Florida v. Charlotte Harbor Phosphate Co., 70 Fed. 883, 17 C. C. A. 472.

8. Supreme Court rule 34 (29 Sup. Ct. xxi) as to bail, when a writ of habeas corpus has issued and been discharged, leaves the bailing of the prisoner pending appeal entirely within the discretion of the court which issued the writ. It is needless to say that there is no constitutional right to bail in any case, after conviction. After all that has been said and written on the subject, the only rule which can be deduced from the authorities is that bail should be granted or denied as best effects exact justice between the government and the defendant according to the character and urgencies of the instant case, determined in the light of the principles of the common law as affected by the enactments of Congress. It is due to social order and proper regard for the majesty of the law, that a sentence, especially when affirmed by an appellate court, should be executed without undue delay, and courts should be careful not to give countenance to factious resistance to the orderly operation of the law by lightly admitting a convicted prisoner to bail. On the other hand, it is also to be borne in mind that the law is quick to afford opportunity and means to the citizens to redress wrongs at its hands, and delighting as it does, in the liberty of the citizen, will not, except in rare instances, compel the prisoner to undergo sentence before the final court has spoken, when he is honestly pursuing legal means to avoid a conviction. The general rule—though that case is not exactly like this in principle—is well stated in Rose ex rel. Carter v. Roberts, 99 Fed. 952, 40 C. C. A. 203, where it is said: "It is the right and privilege of a person deprived of liberty to review to the extent permitted by law the legality of his detention, even when it is pursuant to the judgment or sentence of a court, and the execution of the sentence should be stayed pending a final determination, unless very exceptional circumstances justify the court in refusing to do so."

The sentences, it is assumed, will be commuted to six months' imprisonment, as the President has so ordered. It appears from the record of the trial that the court deemed six months not an unreasonable time in which to enable petitioners to prepare the record and take their writ of error from the Circuit Court of Appeals. The same record, together with the additional matter adduced on this hearing, must be prepared and docketed in the Supreme Court on this appeal, and printed in accordance with the rules, and months would elapse before the petitioners would be in position to make any application for relief to the Supreme Court against the immediate execution of the sentence, or to advance the case, and if it were advanced, it could not be decided before the term of imprisonment in the penitentiary would expire. Some disposition must be made of the prisoners pending their appeal, and here the only disposition which can be made of them is to send them to the penitentiary to undergo sentence, or to detain them in jail, or to bail them, pending appeal. If bail be denied, and they are sent to the penitentiary, the illegality of their detention would become a moot question long before the case could be decided. If they are detained in jail, they would suffer jail imprisonment, for fully as long, if not for a longer term than the commuted sentence in the penitentiary, and still have to undergo punishment there, if they fail in their appeal; while on the other hand, if they succeed, they would, by the denial of bail, have been compelled to undergo an illegal term of imprisonment of several months, either in jail or in the penitentiary.

The prisoners, during the three years in which this prosecution has been pending, have shown no disposition to evade the process of the court. They appeared to abide the judgment of the Court of Appeals, and offer ample bail to secure their appearance to answer the judgment of the Supreme Court, if bail be allowed them, pending appeal to it. There is no reason to suspect they would not be forthcoming, if its decision should be adverse to them. The indictment charges the conspiracy was formed and executed in the Northern district of Florida, but petitioners earnestly insist that the proof shows that it was formed in the Middle district of Alabama, and that it is open to them to raise the constitutional question thus involved in the Supreme Court, on appeal from the judgment of this court on this application. While the court has no doubt that the issue cannot be raised, even under the doctrine of the Nielsen and Bain Cases, on such an appeal, where the conviction is upon an indictment which charges the offense was committed within the jurisdiction of the court which tried it, and is confident that the complaints so earnestly urged, of a denial of constitutional rights in other respects, are ill founded, yet it is mindful of the experience of many trial judges that judgments of whose correctness they are firmly convinced are often reversed, while those about whose correctness they entertain grave doubt are not infrequently affirmed. If this court be in error in remanding the prisoners, the refusal of bail, resulting as it would in the immediate execution of the sentence, or their detention in jail, would work a grievous wrong to them; while

on the other hand, if the order remanding them be affirmed, the prisoners being meanwhile on bail, no harm can come to the government or the defendants. It is not of as much importance to the general administration of justice, under the conditions governing these cases, that these prisoners begin to serve their sentences on any particular day or month, as that in individual cases the constitutional rights of citizens shall not be invaded, by compelling them to suffer execution of a sentence, under what may turn out to be an illegal conviction, pending an appeal from a judgment enforcing it.

The result is that the sentences will be corrected as prayed by the government, the writ will be discharged, and the prisoners ordered remanded to the custody of the marshal; but the execution of the order will be suspended, and petitioners allowed to give bail pending an appeal to the Supreme Court. Counsel may agree upon the amount and stipulations of the bail bond.