## GOODMAN et al. v. UNITED STATES.
### No. 6089.

Court of Appeals of the District of Columbia.
Argued Feb. 6, 1934.

Decided March 26, 1934.

E. Russell Kelly, of Washington, D. C., for appellant Joe Goodman.

Harry T. Whelan, of Washington, D. C., for appellant George McKinley Pitmond.

Leslie C. Garnett, U. S. Atty., and Irvin Goldstein and John J. Sirica, Asst. U. S. Attys., all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB, VAN ORSDEL, HITZ, and GRONER, Associate Justices.

ROBB, Associate Justice.

Appellants were convicted of murder in the first degree under an indictment, the first three counts of which charged deliberate and premeditated malice; the second three charged that appellants purposely killed the deceased while perpetrating an offense punishable by imprisonment in the penitentiary (section 798, D. C. Code, 1901, section 21, tit. 6, D. C. Code 1929).

The material facts as disclosed by the evidence are substantially as follows: At about 10 o'clock on the morning of Sunday, January 22, 1933, the body of William Simms, a watchman employed by Dickey Bros., operating a coal and feed business on Kenilworth Avenue Northeast, in the District of Columbia, was discovered lying face down in a room back of the feed room. A deputy district coroner, who performed an autopsy on

the body, testified: "His (Simms') underwear was burned in an area three inches in diameter, in the middle of the left thigh. He also had a hole in his underwear on the right side three inches above the spine of the bone here [indicating] burned hole in his underwear. His finger nail of the first finger of his right hand was torn off. He had lacerated wounds; by lacerated wounds I mean a ragged wound, to distinguish from an incisive wound that is cut with a sharp instrument, he had a wound three inches long extending over the bone two inches above the middle of the left eyebrow, extending up over the skull; nine wounds on the top of his skull, varying from one to three inches in length, longitudinal, running in the long axis of the skull. He had a gunshot wound of exit two inches above the knee on the external surface of the left leg. He had numerous fractures of the skull about the vault, and particularly on the left side, with considerable hemorrhage into the brain, and spicles of bone, also profuse hemorrhage from the outside where he had been bleeding. He was bleeding from the nose and both ears. The cause of death in this case was fractured skull with associated hemorrhage and shock."

The location of Dickey Bros. place of business was near the railroad yard. On the early morning (about 2 o'clock) of January 22d two railroad detectives saw two colored men in the railroad yard whose conduct aroused their suspicion. One of the men escaped; the officers "threw a flashlight" on the other and ordered him to throw up his hands and, he failing to obey, the officers struck him and arrested him. The man then had his hand in an overcoat pocket, in which was a revolver. The officers wrenched the weapon from the man's grasp and found that the shell immediately in front of the hammer had been exploded; four other cartridges were unexploded. The officers later learned that the man's name was Pitmond, one of appellants. In answer to questions Pitmond said he had won the gun in a crap game. Later Pitmond was turned over to local police. The next day one of the officers making the arrest found a roll of 50 pennies in his automobile on the floor in the back of the car. On the way to the patrol box Pitmond had been seated on the rear seat of that car. The officer also identified a crowbar, sledge hammer, and cold chisel as belonging to the Pennsylvania Railroad. The officer stated: "The tools of the Pennsylvania Railroad were kept in a tool house about 200 feet east of Dickey's coal place."

The officer had seen these tools on January 22d at Dickey Bros. about 1 o'clock in the afternoon.

Pitmond, who could read, made three statements, which were reduced to writing and signed by him. The first of these statements he made on January 22d at 3:30 p. m. in the presence of police officers. In that statement he declared that he got the rolls of pennies and package of dimes (found on him when searched) in a crap game; that he also won the gun in a crap game.

At 7:10 p. m. on that day (January 22d) Pitmond signed a second statement, in which he represented that he and a man named John Jamieson approached Dickey Bros. a little after midnight; they knocked on the door and, when the watchman appeared, asked for shelter for the night. Upon being informed it was against the rules, "John" asked the watchman for a drink of water. As the watchman turned around, "John" rushed him and pretty soon Pitmond heard the report of a gun. As Pitmond went in, "John," with a gun in his hand, had the watchman down on a daybed. They dragged the watchman into the back room and tied him up. They then broke into the safe and took the money it contained. "When they arrested me [quoting from the statement] I had one hand on the gun that came out of the place we had broken into and the other hand on the money we had taken from there." Asked what understanding he and "John" had, before they went into the building, in case they had trouble with the watchman, he replied: "He said he intended to knock him cold."

The third statement was signed at 1:30 p. m. on Tuesday, January 24th. In this statement he implicated appellant Goodman. He said that Goodman asked the watchman for a drink of water. As the watchman turned, Goodman rushed in and the door slammed on him, and before Pitmond could get in he heard a shot fired. When he got in, the watchman was lying on his back on the bed. "Joe (Goodman) had one hand on the gun and the watchman had one hand on the gun, and Joe was beating the watchman on the head with the piece of iron. And as I went to give Joe a helping hand the pistol dropped and I caught it and put in in my pocket. I then hit at the watchman with my piece of iron and hit Joe on the hand. Joe was over the watchman and blocked me from getting to him. So after the watchman was knocked unconscious, Joe left to get the tools to work with." Asked if the money

that was taken from him when he was searched was the money taken from the safe by Goodman, he replied in the affirmative. Asked what understanding he and Goodman had before they went into the building about what to do in case they had trouble with the watchman, he replied: "Joe already had an automatic pistol, and he intended to kill the watchman, if he glimpsed him, in order to get the money. After he rushed him on in and hit him on the head he figured he didn't need the pistol."

Goodman, who about February 1st was arrested in Virginia, to which place he had fled, and on February 3d was brought back to the District, signed a statement on February 6, 1933. In this statement he admitted that he and Pitmond had broken into the warehouse of Dickey Bros. for the purpose of robbery, but attributed the actual killing of the watchman to Pitmond. He stated that he and Pitmond were to divide the money "fifty-fifty."

When the three·statements of Pitmond were offered in evidence, they were objected to by his counsel on the ground that coercion had been used in obtaining them. The jury was excused, and Pitmond and several officers testified. Pitmond admitted that at the inquest the coroner had told him that he did not have to make a statement, and that any statement he made would be used against him; that his testimony before the coroner was substantially the same as his third statement. The court (out of the presence of the jury) characterized Pitmond's testimony as "a wholly improbable story," and later admitted·the statements in evidence.

The police officers testified in the presence of the jury substantially as they had previously testified out of the jury's presence. One of the officers testified that after Goodman had signed the statement of February 6th that statement and the third statement of Pitmond were read in the presence of both Pitmond and Goodman. That after they were read, Pitmond said to Goodman, "I lied like a dog to save you. I even had them chasing around looking for a white man." That "Pitmond then said he had to name Goodman in it, and Goodman said he didn't mind him (Pitmond) giving his name in the case, but he objected to Pitmond saying he (Goodman) did all of the beating of the watchman."

No testimony was introduced before the jury on behalf of appellants.

At the close of the government's case, counsel for Goodman for the first time filed a motion to quash the indictment "because of the fact that there was no legal evidence before the grand jury at the time this matter was considered, at the time this present indictment was voted, to in any wise connect up the defendant Joe Goodman with this offense." The motion was overruled, and a motion in arrest of judgment was later filed and likewise denied.

Counsel admits that the proceedings before the grand jury were secret, but asserts that the names of the witnesses who appeared before that body are set forth on the back of the indictment, and that the same witnesses with others testified at the trial. A review of that evidence, counsel argues, demonstrates that there could have been no legal evidence before the grand jury implicating Goodman.

■ In the first place, there is no requirement in the District of Columbia that the names of witnesses·testifying before the grand jury should be indorsed on the indictment. See Fisher v. United States, 1 Okl. 252, 258, 31 P. 195; State v. Calder, 23 Mont. 504, 506, 59 P. 903; Padgett v. State, 64 Fla. 389, 395, 59 So. 946, Ann. Cas. 1914B, 897; 16 C. J. 795, § 2026.· The fact that names are indorsed is not conclusive that the testimony of such witnesses was all the evidence before the grand jury. There is a presumption that the indictment was found upon proper evidence. Ex parte Harlan (C. C.) 180 F. 119, 129, affirmed 218 U. S. 442, 31 S. Ct. 44, 54 L. Ed. 1101, 21 Ann. Cas. 849; Noll v. Dailey, 72 W. Va. 520, 79 S. E. 668, 47 L. R. A. (N. S.) 1207; see, also, United States v. Olmstead (D. C. W. D. Wash.) 7 F.(2d) 756; Arnstein v. United States, 54 App. D. C. 199, 296 F. 946. The murder was committed on the 22d of January, and the indictment was not returned until the 1st of February. It would be a violent presumption in the circumstances of the case to conclude that when the indictment was returned the government was without any legal evidence indicating the guilt of Goodman. "Without considering how far, if at all, the court is warranted in inquiring into the nature of the evidence on which a grand jury has acted" (Holt v. United States, 218 U. S. 245, 31 S. Ct. 2, 4, 54 L. Ed. 1021, 20 Ann. Cas. 1138), we rule that the trial court did not err in denying the motion to quash.

■ In behalf of both appellants it is contended that the government should have been required to elect between the first three and the last three counts of the indictment. This

744

contention is without merit. We cannot agree with counsel that there is no evidence that would have justified a verdict of guilty on the counts charging premeditated murder. We think there was evidence that appellants, before they entered Dickey Bros.' place of business, had formed the purpose of killing the watchman if it should be necessary in their unlawful quest for money. It would hardly be contended that the evidence did not warrant a verdict of guilty on the last three counts. It is settled law that a general verdict and judgment under an indictment containing several counts will not be reversed if any one of the counts is good. Goode v. United States, 159 U. S. 663, 16 S. Ct. 136, 40 L. Ed. 297; Claassen v. United States, 142 U. S. 140, 12 S. Ct. 169, 35 L. Ed. 966; Evans v. United States, 153 U. S. 584, 14 S. Ct. 934, 38 L. Ed. 830; Egan v. United States, 55 App. D. C. 306, 5 F.(2d) 267.

█ In behalf of Pitmond it is contended that the court erred in admitting in evidence the statements signed by him. This contention is based in part upon the testimony of the two railroad detectives, who admitted that they struck Pitmond and knocked him down at the time of his arrest. Since it was not then known that the murder had been committed and inasmuch as these detectives surrendered Pitmond to the local officers before the murder became known, their attitude toward Pitmond in no way coerced him into making any one of the three statements he subsequently made. The testimony of the officers who were present when these three statements were made, when contrasted with Pitmond's testimony indicated, as found by the trial court, that no coercion was used. Moreover, it is in evidence that Pitmond made the same statement before the coroner that he made in his third signed statement. The trial court was careful to instruct the jury on this branch of the case as follows: "If, upon your consideration of this evidence and the circumstances which have been related to you, you are of the opinion that these statements were obtained from these defendants under circumstances which indicate that they were not the free expression of the defendants' minds, then you should give them no weight at all. You should disregard them." It is significant that it is not contended that coercion was employed in obtaining Goodman's confession; nor was there any evidence to that effect.

█ No objections were made or exceptions taken to the charge of the court, although comments of counsel were invited. It is now suggested that "a close reading of the instruction (regarding degrees of murder) will show that while, in a general way, it contains the law covering this subject, it is done in such a long, vague, rambling manner that it is hard to believe that a lay jury would understand it." In our view, this criticism is not warranted. The court ought not to be criticized for having stated in considerable detail the law regarding the different degrees of murder.

We have read the record with painstaking care and are convinced, not only that the verdict was justified by the evidence, but that the rights of the accused were properly safeguarded.

The judgment must be affirmed.
Affirmed.