**UNITED STATES of America,
Appellee,**

**v.**

**Jacob E. WEISSMAN, Appellant.**

**No. 143, Docket 23315.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 15, 16, 1954.

Decided March 1, 1955.

Simon H. Rifkind, New York City (George B. Gelman, Frederick H. Block, Robert B. Block, and Block & Block, New York City, of counsel), for appellant.

Powell Pierpoint, New York City, J. Edward Lumbard, U. S. Atty., New York City (David Jaffee, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before L. HAND, SWAN and HINCKS, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal by the defendant, Weissman, from a judgment of conviction under § 152 of the Penal Code, 18 U.S.C.A., in two counts: one, charging him with concealing the property of a corporation, the "Charlotte Textile Company" (which we shall call "Charlotte"), from its trustee in bankruptcy; and the other, for making a false oath in the bankruptcy proceeding of that company. The jury found the accused guilty on both counts, and the chief question that we shall consider is whether there was evidence to support the charge. The facts in outline were as follows. For some years before the events here in issue Weissman had been a jobber in textiles, doing business in New York City. In 1947 he was the sole owner of a number of corporations; and, although he was neither an officer, a director, nor indeed even a shareholder of record in any of them, he was the only person financially interested in any of them, and he had absolute control of their conduct and of all transactions between them, or between one of them and any third persons. He is to be treated as though he

was the sole shareholder in all. His main business was to buy cotton cloth from mills in the South ("greige goods") to "convert" it—i. e. impress or weave designs upon it—and sell it to jobbers. At times however he sold "greige goods" unchanged directly to the trade. For the most part he bought his cloth through "Charlotte," from which he distributed it either "converted," or "unconverted" to another of his corporations which in turn sold it to the public. Among these subsidiaries of "Charlotte," as we will call them, were two corporations, "Mercury" and "J. E. W. Inc.," out of transactions with which the alleged offenses arose.

When goods were bought by "Charlotte" and arrived in New York they were all stored in a single warehouse, owned by another of Weissman's corporations, whence they were sold to the trade under the name of the one of the subsidiaries. (Whether those that were "converted" were not so stored until after their "conversion," or were stored, withdrawn and restored, does not appear and is not important.) Weissman's ordinary practice was to consign a parcel of goods to one of the subsidiaries, to charge it with the price on its books and to credit "Charlotte" with a corresponding amount. These entries were not, however, always retained, if it became necessary to provide "Charlotte" with cash. Entries would at times then be made, crediting a subsidiary which happened to be in funds with payment to "Charlotte" of the needed sum, and making a corresponding debit against "Charlotte." The cloth with which the offense at bar is concerned, was "greige goods" that "Charlotte" had bought at the mills and that "J. E. W. Inc." and "Mercury" sold to the trade. Whether it had been delivered to their purchasers direct from the mills, or had been stored in the South, or mingled with other goods in the warehouse, does not appear. However, so far as the books disclosed it always remained "Charlotte's" property, until the bales—identified by their numbers, amounting to more than $187,000, —were sold by "J. E. W. Inc." and "Mercury," to which the proceeds were credited. The only possible inference is that Weissman had directed these goods to be treated as transferred to the subsidiaries, and the proceeds to be retained by them. The prosecution's position is that this justified a finding that this transaction implied a cross claim—a credit—in favor of "Charlotte"; and such a finding was in fact necessary, because it was this "account" that Weissman was charged with concealing and with fraudulently omitting from the schedules in bankruptcy of "Charlotte," when that corporation became bankrupt a number of months after the transfer had been made. The prosecution argues that the jury might infer the existence of the contractual claim from the way the business was conducted and from Weissman's testimony; but that, if not, the diversion of the goods from "Charlotte" to the two subsidiaries was an appropriation, out of which a claim in tort arose that would serve equally well. Weissman answers that there was no evidence to support the inference that any claim in contract was intended; and that, since he was the only person beneficially interested in "Charlotte," it was no more than a dividend which he was free to make without a formal resolution, unless the prosecution proved that "Charlotte" was insolvent at the time, which it did not do.

■■ It is true that there can be legal transactions between two corporations all of whose shares are owned by a single individual, and that the same obligations will arise out of them as would arise, had they been between either corporation and a third person. That a "one man" corporation is a valid jural person was decided by the House of Lords in 1897,[1] and has not been doubted ever since.[2] It is enough if the transaction takes an "objective" form;

1. Salomon v. Salomon, 1897 A.C. 22.

2. Wheeler v. Smith, 9 Cir., 30 F.2d 59, 61; Goldstein v. Wolfson, 2 Cir., 132 F.2d 624; Arnold v. Phillips, 5 Cir., 117 F.2d 497, 503; In re Madelaine, Inc., 2 Cir., 164 F.2d 419.

and we should have had no trouble in the case at bar, if Weissman had directed the usual entries recording a sale to be made in the books of "Charlotte" and the two subsidiaries. The prosecution sought to supply the absence of any such entries by saying that Weissman "intended" the transfer to be a sale; and that, if so, his intent, though unexpressed, was enough to create a contract. First, as to the existence of such an "intent," as a question of the content of Weissman's mind at the time. The evidence is undisputed that he directed Lowen, his factotum, not to "bill" the "greige goods" in question against the subsidiaries, and to keep the invoices for them at his home separate from other invoices. On the other hand, the following excerpts from Weissman's testimony read as though he might have supposed that there was a claim for the value of these parcels in favor of "Charlotte." The judge asked him whether he had told his attorney "about these exchanges of goods" while the schedules were being prepared, and he answered that he did not discuss the question because "the overwhelming amount of merchandise that I had given to Charlotte closed that particular question. There was no need." Again: "I explained to him"—the attorney—"that there were" (sic) "merchandise transferred to Charlotte Textile Company through the years." Later, when asked whether an earlier attorney had advised him as to "the importance of keeping the assets of the corporation carefully recorded," he answered that he remembered no such advice, and "I didn't understand at the time, since the corporation was my own, it didn't belong to anybody else, that such specific care had to be had." (We take it that the "corporation" was "Charlotte.") Immediately thereafter in speaking of a list of goods delivered to "Charlotte" he was asked: "So that these goods were discharged, would discharge any debt that you would owe for goods that you have taken from Charlotte; is that correct? A. Well, yes sir; of course, sir. Q. In other words, you realize that if you had taken goods from Charlotte, you would have to replenish it with goods of your own; isn't that correct? A. Well, of course, if that was the case." In answer to the judge he added: "if Charlotte used these goods of mine at some times prior that I certainly was entitled to get back some of the goods at some time * * * or vice versa, yes." "The Court: If you used goods of Charlotte you intended to repay that by goods? The Witness: That's right; by goods."

Apparently, therefore, Weissman did expect to balance any goods transferred from "Charlotte" by the return of an equal amount; certainly a jury might so have found. Nevertheless, we are not sure that this presupposed that he thought that the withdrawal had created a legal claim or debt, in favor of "Charlotte." True, the evidence in a criminal prosecution need be no stronger than in a civil action to support the verdict of a jury; but in a civil case there must be at least a preponderance. To us it appears to be at best doubtful whether Weissman supposed that he was creating legal obligations; or whether he merely did not need to use "such specific care" in keeping the mutual accounts between his corporations, because *the* corporation was "my own, it didn't belong to anybody else." It may be that he merely believed that he might shuffle about the goods as he pleased in his variegated cast of corporations, because in the end it all came down to his own interests; though he did in fact strike balances in the end. We do not, however, find it necessary to say whether or not a jury would have been justified in finding that he meant a debt to arise.

■ It is of course true that no express promise would have been necessary to create a claim if it was reasonable to imply a promise from the setting, taken as a whole, in which the transfer was made. For instance, if Weissman had never kept separate books to record transactions between his several corporations, it might have been enough that he authorized "Charlotte" to transfer

goods to the two subsidiaries; from the delivery alone a promise might have been implied. But that was not his practice; when he meant a claim to arise, he had the proper entries made in the books. True, it does not appear that the transfer at bar was the only exception to that practice, though it may have been; but it was a deliberate exception, specifically ordered by him, and followed by a separation of the invoices from those put through the regular course of the business. Deliberate exceptions presuppose a different purpose from the usual purpose. Nor may we resort to the device by which courts at times construct an intent, not otherwise proved: i. e. that in its absence the transaction would have been unlawful. There was nothing unlawful in Weissman's passing over the merchandise in question as a gift to the two subsidiaries.[3] Had he been charged with a conspiracy to make ready for abstracting assets from "Charlotte's" trustee in bankruptcy, perhaps the evidence could have convicted him; but that would have been a different crime. Judged by what was done as to these parcels, even under the most favorable interpretation of the setting, there was not enough to support a finding that a debt had been created.

There remains, however, the position which we understand the prosecution also to take, that, because Weissman was the only individual who at the time had any interest in any of the corporations, his "intent"—or purpose—that a claim should arise was enough to create it, even though it was neither expressed, nor to be implied from the overt facts. The argument can perhaps be put as follows. To form a contract there must ordinarily be two parties who join in a common understanding; and when a contract is made between two corporations, each dominated by a single individual, there can be only one party and one will; and it is nonsense in such cases to think of that individual as making a promise to himself; contracts are intended to foreclose future conduct. Therefore, when the law says that a contract arises between two such corporations, it can only mean that, when certain forms are observed, by which the single individual wishes to affect the relative interests of the two corporations, his purpose will be realized. This can be, and is, nothing but a form, used wholly out of the context for which it was devised. However, it is true that the desire of the single individual will be realized if he goes through those forms. Suppose then that the contract is oral; surely, the law will not demand that the putative individual shall propose and accept an oral promise to himself; and, if not, why is it not enough to prove that he wished the same legal consequences to attend an act of his that would have attended it, had he gone through the meaningless formality of putting in writing what he wished to do? And, to come to the case at bar, why should not his overt act of delivery be "interpreted" by its attendant purpose?

It appears to us that, however plausible this may sound, it should not prevail. Granted that the occasion inevitably lacks the basic substratum of all contracts—a consensus of intent—and that the whole structure of the contract in such situations must inevitably be fictitious, we must follow the pattern that we have adopted, and that pattern certainly demands some overt indication of "intent" that is more than unilateral. Not only must there be two formal persons to the contract, but they must both conduct themselves as would be necessary in the case of individuals who make a contract. If we are to play the piece with marionettes we must at least have all the dummies perform the same parts that are required of living actors. Therefore, even if Weissman's testimony would have supported a finding that his

3. Pepper v. Litton, 308 U.S. 295, 311, 312, 60 S.Ct. 238, 84 L.Ed. 281; Spencer v. Lowe, 8 Cir., 198 F. 961; Smith v. Moore, 9 Cir., 199 F. 689; Petition of Allen, 1 Cir., 9 F.2d 209; Arnold v. Phillips, 5 Cir., 117 F.2d 497, 502; Groh's Sons v. Groh, 80 App.Div. 85, 80 N.Y.S. 438.

purpose or "intent" had been to create a debt in favor of "Charlotte," such a finding would not have been enough to support a verdict. Proof of contemporaneous manifestation of contractual intent to create the debt was required,—and that, as we have pointed out, was lacking.

However, although the conviction must be reversed, we do not wish to be understood to commend the financing that Weissman adopted; if it was not in fact designed fraudulently to protect him against future creditors, it was at any rate a contrivance well adapted for that purpose. Nevertheless the punishment he may deserve is one thing; and whether he was guilty of the crime charged is a different thing. Today it is of especial importance that we should not confuse the two. Against the possibility that the case may be tried again we will say that we think that evidence, relating to income tax evasions, had best be ruled out. Strictly considered, it may have had a relevance in establishing Weissman's domination over all the corporations, but its contribution to that issue, even if Weissman had not conceded it, was not very important, and the chance that it might divert the jurors' minds from the issue was very great. It was indeed the kind of evidence whose admission rests in the discretion of the judge; and we are not prepared to say that our disagreement with him is so positive that it would have called for a reversal, standing alone. Nevertheless, we take this occasion to say that its admission on another trial would we think be an unwise exercise of discretion. We also think that the testimony of Weissman taken under § 21, sub. a, of the Bankruptcy Act, 11 U.S.C.A. § 44, sub. a, was within the immunity granted by § 7, sub. a(10), 11 U.S.C.A. § 25, sub. a(10). The referee had directed him to sign the schedules in bankruptcy, and that brought him within § 7, sub. b, for he so became one of the "stockholders or members" of "Charlotte" who was "designated by the court" to "perform the duties imposed upon the bankrupt." We can see no reason for denying to such a person the protection that is given to the bankrupt, obviously for the purpose of insuring a full disclosure of the facts. Our decision in In re Bush Terminal Co., 102 F.2d 471 (the only one made after subdivision b was added to § 7), did not concern anyone who had been "designated by the court" to perform the bankrupt's duties.

Judgment reversed; cause remanded for further proceedings consistent with the foregoing opinion.